## MILLS v. ELLIOTT.

## MILLS v. DARLINGTON.

PATENTS; INTERFERENCE; JOINT APPLICATIONS; ORIGINALITY; EVIDENCE.

1. The burden of proof is on the junior parties to an interference to overcome the prima facie case made by the prior application of the senior party.

2. Joint applicants who are junior parties to an interference must show by credible evidence that they jointly conceived the invention of the issue on or about the date alleged in their preliminary statement.

3. Where in an interference between joint applicants, who were the junior parties, and who had assigned their invention to their employer, a manufacturing company, which had caused the application to be filed in the Patent Office through its solicitors, and an individual applicant, the senior party, who had been an employee of the same company, involving originality of the invention of the issue rather than priority of conception, it appeared among other things, that the invention was an improvement upon a device manufactured by the company; that the senior party, during his employment, filed an application through the solicitors of the company, to whom he was introduced by the president of the company, and himself paid their fee, which was afterwards returned to him by them, owing to a conflict of interest between him and the company, whereupon he employed another solicitor; that, after the senior party left the company's employment, the company brought suit against him for specific performance of an alleged oral agreement, alleged to have been made at the time of his employment, to assign all inventions made by him to the company, in which suit the company was unsuccessful; that the testimony failed to show with any certainty that the junior parties jointly invented the improvement; that although the president of the company claimed that the senior party was deficient in practical knowledge and was discharged for that reason, the testimony showed that he was retained for a year, although his contract of employment was for six months, and that dissatisfaction with the senior party's services followed the controversy in the Patent Office,—it was held that, although the senior party's testimony was not above adverse criti-

cism, he was nevertheless entitled to an award of priority. Citing *Ladoff* v. *Dempster,* 36 App. D. C. 520.)

4. The case of a senior party to an interference does not depend upon the credibility and weight of his own testimony, but he is entitled to an award of priority, unless the junior party has overcome his prima facie case.

Nos. 730 and 731. Patent Appeals. Submitted November 16, 1911. Decided January 2, 1912.

HEARING on an appeal from decisions of the Commissioner of Patents in interference cases.　　　　　　　*Affirmed.*

The facts are stated in the opinion.

*Messrs. Bakewell, Byrnes & Parmelee* for the appellants.

*Mr. Frederick W. Winter* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

These are appeals in two separate interference proceedings. But whilst separately declared, they relate substantially to the same invention and involve the same controlling issue. The testimony was taken to be used in both. Separate decisions were rendered in the Patent Office, after consolidation, and they have been heard together in this court.

The subject-matter of the invention is an improved rotary motor, operated by means of compressed air, and devised for use in removing the scale from boiler tubes, though it may be put to some other uses.

The first application making claims to any part of the invention was a joint one filed by Edward R. Mills and Charles A. Conn, and Herman Van Ormer on December 8, 1906. Philip J. Darlington filed one application February 15, 1907, and another June 17, 1907. Mills and Conn filed two separate applications September 24, 1907. William S. Elliott filed an

application January 20, 1908. Van Ormer filed a separate application November 12, 1907, which resulted in a patent August 30, 1910.

Four interferences in all were declared, involving some of the claims in the various applications. Two having been disposed of in the office finally, the litigation proceeded in the last two. Interference No. 28,678, to which Elliott was a party also, was declared with an issue of six counts as follows:

"1. In a rotary motor, a piston shaft, a rear bearing for said shaft, an air space adjacent to said bearing, and means for venting said space.

"2. A rotary motor having an air space at the rear end of the piston shaft, and means for venting said space.

"3. In a motor, a cylinder having a longitudinally extending admission port, ported heads fitted to the ends of the cylinder and detachably secure thereto, said heads having bearings for the motor shaft, and the rear head having an admission chamber therein, the rear head having a vent opening therein communicating with the rear shaft bearing.

"4. A rotary motor having front and rear heads, a cylinder secured between the heads, a piston shaft journaled in the heads, a collar on the rear end of said shaft behind its bearing and air chamber surrounding said collar, and means for venting the air chamber.

"5. In a rotary motor, a piston shaft, a rear bearing for said shaft, and an air space adjacent to said bearing, said shaft having a shoulder forming a thrust bearing against the front wall of said air space.

"6. In a rotary motor, a piston shaft, a rear bearing for said shaft, an air space adjacent to said bearing, said shaft having a shoulder forming a thrust bearing against the front wall of said air space and means for venting said space."

Appeal No. 730 embodies this controversy. Interference No. 28,679 (Appeal No. 731) was declared with an issue of eleven counts, as follows:

"1. In a motor, a cylinder having longitudinally extending admission and exhaust ports, ported heads fitted to the ends

of the cylinder, and tension rods connecting the heads, said heads and cylinder having seats for said rods.

"2. In a motor, a cylinder having a longitudinally extending admission port, a head at one end of the cylinder having an admission chamber therein, and a plug seated within the admission chamber and having a port therethrough which connects the chamber with the admission port of the cylinder.

"3. In a rotary machine, a cylinder having a longitudinal piston chamber located eccentrically therein and having its ends circular counterbores, heads, seated in counterbores, and tension rods connecting said heads.

"4. In a rotary machine, a cylinder having a longitudinal piston chamber therein, heads closing the ends of said cylinder, and a piston shaft journaled in said heads, the rear end of said shaft being reduced and seated in the rear head, and the front end of said shaft being of full diameter, and projecting through the front head, and being provided with means for the attachment of a tool.

"5. In a motor, a cylinder having a longitudinally extending admission port, a head at one end of the cylinder having an admission chamber therein, and a bushing member seated within the admission chamber, and having a bearing for the motor shaft, and also having a port therethrough which connects the chamber with the admission port of the cylinder.

"6. In a motor, a cylinder having a longitudinally extending admission port, a head at one end of the cylinder having an admission chamber therein, a bushing seated within the admission chamber and having a port therethrough which connects the chamber with the admission port of the cylinder, and a piston shaft journaled at one end on said bushing and having a thrust collar at its rear end engaging said bushing.

"7. In a motor, a cylinder having longitudinally extending admission and exhaust ports, ported heads fitted in the ends of said cylinder, a bushing member seated in one of said heads, and tension rods connecting the said heads and engaging the bushing member.

"8. In a motor, a cylinder having a longitudinally extending

admission port, a head at one end of the cylinder having an admission port therein, a supply pipe extending into said admission chamber, and means for filtering the air entering said chamber from said pipe.

"9. A rotary motor having a rear head provided with a shaft bearing, a front head also having a shaft bearing, and lubricant passages in the front head, said passages communicating with the front shaft bearing, and one of them extending through the motor cylinder and into the rear head to the rear shaft bearing.

"10. A rotary motor having front and rear heads, and a cylinder secured between said heads, the rear head having a chamber communicating with the air supply for the motor and also with the interior of the cylinder, and the front head having a lubricant passage extending therethrough and through the cylinder wall and rear head to the said chamber.

"11. A rotary motor having a rear head, a bushing screwed in said head, and a hose shank extending through the said bushing and having a flange at its inner end, said bushing having a bore which is larger than the body of the shank, but which is of smaller diameter than the flange thereof."

By the decision of the Examiner of Interferences in No. 28,678, rendered March 16, 1910, priority was awarded to Elliott as to counts 1 and 2 and to Darlington as to counts 3, 4, 5, and 6. Darlington took no appeal. On appeals prosecuted by Elliott, and Mills and Conn, the Examiners in Chief reversed the decision appealed from, awarding priority as to Elliott as to count 3, and to Mills and Conn as to counts 4, 5, and 6. Darlington appealed to the Commissioner, who affirmed the award as to count 3, but reversed it as to counts 4, 5, and 6, awarding priority to Darlington. From this decision Mills and Conn have appealed from so much thereof as awarded priority to Darlington. Darlington took no appeal. In No. 28,679 (Appeal No. 731), the Examiner of Interferences held that count 11 was not patentable to either claimant; as to the remaining ten counts he awarded priority to Darlington. On appeal this latter part of the decision was reversed, and prior-

ity awarded to Mills and Conn as to the ten counts remaining. On appeal to the Commissioner by Darlington, the interference was dissolved as to count 11, the decision appealed from was reversed, and priority was awarded to Darlington as to ten counts. The Examiner of Interferences and the Commissioner criticized the evidence of both parties, declaring it unsatisfactory, and concluded that Mills and Conn had not overcome the burden of proof imposed upon them as the junior parties. In reaching his conclusion, the Commissioner said he had not found it necessary to consider Darlington's own testimony.

The Examiners in Chief (two members only, sitting) held that Darlington was wholly discredited, and that the evidence on behalf of Mills and Conn, while unsatisfactory, was sufficient to sustain the burden of proof. This appears in the following extract from their opinion in No. 28,679 (Appeal 731):

"The Examiner of Interferences considered that the testimony introduced on behalf of Mills and Conn is insufficient to meet the demands of the burden of proof resting upon them by virtue of the fact that their applications were filed later than the applications of Darlington. The unsatisfactory character of the testimony introduced on behalf of Mills and Conn must be admitted, but in view of the fact that Darlington is discredited, we do not attach the same significance to the question of the burden of proof that we otherwise would. And, moreover, as the question to be decided is one of originality, and as the testimony shows that the Liberty Manufacturing Company was in possession of a motor or motors embodying the subject-matter of all of the counts in issue prior to the filing dates of either of the parties, the order of their filing dates loses its usual significance. The question to be determined is merely who was the originator of the motor or motors so proven to have been made."

The office tribunals have discussed the several groups of counts relating to different features of the invention in a clear and satisfactory manner, and it is necessary, only, to consider the one question upon which the entire controversy rests. This

is not one of priority of conception of the invention, but rather of originality; the parties are not independent inventors. Darlington, by virtue of his prior application, is the senior party, and Mills and Conn have the burden of overcoming his prima facie case. They must show by credible evidence that they jointly conceived the invention on or about the date alleged in their preliminary statement. The depositions of the chief witnesses are lengthy, and references are made to some documentary evidence filed as exhibits. These have not been incorporated in the printed record, but their substance and effect have been stated in the decisions below, as well as in the briefs of counsel, with substantial agreement. It is not necessary to consume space with a discussion of this evidence in detail, and we shall content ourselves with a statement of the conclusions therefrom on which our judgment is founded.

In the first place, there are some undisputed facts and circumstances which may be recited. W. S. Elliott, the principal witness for the appellants, is the president of the Liberty Manufacturing Company, a Pennsylvania corporation, whose office and factory are in the city of Pittsburg. That corporation is the assignee of Mills and Conn, and of Van Ormer, and their applications, including the joint application of the three, of December 8, 1906, were filed by Elliott's direction, and through the company's retained counsel. Darlington became vice president and general manager of the company on November 5, 1905, under a contract, terminable or renewable at the end of six months. He was paid a salary and a certain percentage of net profits. He was in special charge of the manufacturing department, under the direction of the president, Elliott. Conn was a traveling salesman of the company. Mills was superintendent and foreman of the manufacturing department, under Darlington, and was employed in May, 1906, upon his recommendation. Van Ormer was a machinist in the employ of the Hartford Street Railway Company, and had constructed a machine for removing boiler tube scale. It was a compressed air motor. Prior to this, the Liberty Company had been manufacturing and selling a water-driven motor. An agent of the

company having seen Van Ormer's motor in a New York boiler house, negotiations were entered into with Van Ormer, which resulted in the construction and delivery by him of a sample motor, and the transfer of the same and all his rights to the Liberty Company. Van Ormer had not applied for a patent, and, it seems, did not deem his construction patentable. It is in improvements upon this motor that the inventions in issue consist. These attempted improvements ran through the year 1906. Darlington is admitted to have devised a curved form of cylinder, called the "roto-centric curve," which, it is claimed, enables the larger motor of Van Ormer to be made of smaller size for use in small boiler tubes. In January, 1907, Darlington went to the solicitors of the Liberty Company with a letter of introduction from Elliott, and retained them to file the application of February 17, 1907. The fees were paid by him personally, and the application was in his name and for his benefit. The application of June 17, 1907, was filed in the same way, but no letter of introduction from Elliott was then necessary. The first application embraced the "roto-centric-curve" feature also. When the controversy arose, the solicitors informed Darlington that they had been under the impression, when they accepted his retainer, that there was no conflict with the interest of the company, and returned the fee paid to them. There was no objection to this, and Darlington retained another solicitor to represent him in the Patent Office. Darlington was discharged by the company, and severed his connections therewith on August 31, 1907. Elliott, the chief witness for Mills and Conn, admits that he knew that Darlington intended to patent his "roto-centric curve," and gave him the letter to his solicitors with that expectation; but denies that he had knowledge of his purpose to claim any other improvements in the motor. His first step, upon discovery, and after disagreement with Darlington, was the institution of a suit in equity against him, in the name of the company, alleging a verbal agreement upon his employment, to assign all inventions made by him during the same to the company. A specific performance of this agreement was prayed, and a temporary in-

junction was obtained, restraining Darlington from assigning the inventions to others, pending the suit. Testimony appears to have been taken, but it is not set out in the record. The injunction was, however, dissolved, and the bill dismissed. Thereafter the rival applications were filed by Elliott's direction. Mills was not called as a witness, though it seems his attendance might have been procured. No original sketches have been produced by any of the parties, and of the blue prints produced from the files of the company, nearly all bear the signature of Darlington. These indorsements are attempted to be explained by Elliott, as indicating not that they were made from Darlington's sketches, but by reason of his duty as manager of the mechanical department to formally approve all working drawings and plans to be used in manufacture.

Inferences reasonably deducible from some of the foregoing circumstances have more or less bearing upon the weight of the evidence. The only tribunal of the office which found the evidence on behalf of the appellants to be sufficient to overcome the prima facie case of the appellee admitted that it was of an unsatisfactory nature. In this we fully concur, and we further concur with the other tribunals that it is not of sufficient weight to sustain the burden of proof.

It was necessary to show that Mills and Conn jointly invented. The former, an experienced machinist, did not testify, and Conn, who was a traveling salesman of the company, did not testify with any certainty to joint invention. The burden of his testimony was a denial of invention by Darlington and an attack upon his credibility. Elliott was the chief witness relied on to support the claims of Mills and Conn, who had assigned their interest to the company, of which he was president and majority stockholder. His testimony tends to show that Conn and himself were the inspirers of nearly all of the improvements, and lacks certainty as regards the participation of Mills. It must be remembered that these efforts to improve the Van Ormer motor began in February, 1906, and that Mills did not come to the company's shops until May of that year. In this connection, also, it is to be borne in mind that Elliott inspired

the joint application of Conn, Mills, and Van Ormer. This application, made after the alleged "tie rod" improvement, a feature of the issue, did not include that construction. This joint application, it is now admitted, should have been in the name of Van Ormer alone. The explanation attempted to be made of this blunder, based on ignoranec of law and facts, at the time, is a lame one. It is difficult to believe that the necessity of filing an application in the name of the real inventor alone *is not well known to the manufacturers of machinery and* mechanical devices in this country, and that the facts relating thereto are not thoroughly investigated before making the application. Elliott claims that Darlington was deficient in practical knowledge and was discharged for that reason, yet he had been retained for more than a year after the end of the six months' period, and permitted to receive a considerable sum of the net profits. This dissatisfaction with Darlington seems rather to have followed upon the beginning of this controversy, because Elliott, in January, 1907, gave him the introduction to the company's patent solicitors, knowing that he intended applying for a patent for one improvement, at least. He denies, however, that he had any further knowledge, while Darlington, on the other hand, testifies that he knew all. Elliott's assertion that he did not know of the applications, and that he knew positively that Darlington was not the true inventor, is inconsistent with his action in filing the bill to compel Darlington to assign his claims to the company. If he knew the claims to be baseless, why seek to compel their assignment? If convinced at that time, as he now says he was, that Darlington's claim was false and fraudulent, his proper course was to do as he did after the adverse decision in that case; namely, file the rival applications and contest the right in the Patent Office. Similar conduct was said in a recent case to be strongly persuasive that the claimant was then considered the inventor. *Ladoff* v. *Dempster,* 36 App. D. C. 520–530. Nor is Elliott's testimony to Darlington's incompetency as the manager of the mechanical department of his business reconcilable with the continuation of his

contract of employment until the conflict occurred concerning these inventions.

Darlington's own testimony has been justly criticized by the Examiner of Interferences and the Commissioner, who, nevertheless, awarded him priority. Elliott's testimony is, to say the least, subject to similar animadversion. But Darlington's case, as held by the Commissioner, does not necessarily depend upon the credibility and weight of his own testimony. By virtue of his seniority, he is entitled to the award, unless his opponents have been able to overcome his prima facie case. This, we agree with the Commissioner, they have not succeeded in doing. We are constrained, therefore, to affirm the decisions.

It is so ordered, and that this decision be certified to the Commissioner of Patents.                    *Affirmed.*